**Barbara Jean BERRY, et al., Plaintiffs,**

v.

**SCHOOL DISTRICT OF THE CITY OF BENTON HARBOR, et al., Defendants.**

No. 4:67–CV–9.

United States District Court, W.D. Michigan, Southern Division.

July 15, 1999.

As Amended July 21, 1999.

---

Kathleen McCree Lewis, Dykema Gossett, PLLC, Detroit, Jonathon D. Rowe, Dykema, Gossett, Spencer, Goodnow, et al, Ann Arbor, Steven Marchese, Syracuse University College of Law, Office of Clinical Programs, Syracuse, NY, for Plaintiffs.

John D. Tully, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Defendant Benton Harbor School Dist.

Timothy P. Gladney, Ann Arbor, MI, for Defendant Eau Claire Public Schools.

Edith C. Harsh, Jennifer M. Granholm, Attorney General, Executive Division, Jane Orris Wilensky, Jennifer M. Granholm, Attorney General, Education Division, Lansing, for Benton Harbor School District, Coloma Community Schools, Eau Claire Public Schools, State Board of Education, Berrien County Intermediate School District, defts.

### OPINION RE PETITIONS FOR STATE SCHOOL AID FUNDING

HILLMAN, Senior District Judge.

This matter is before the court on the renewed petition of Benton Harbor Community Academy ("BHCA") to permit

state school aid funding (docket # 1258) and the petition of Benton Harbor Charter School ("BHCS") to permit state school aid funding (docket # 1261).

## I. BACKGROUND

This case began on November 16, 1967, with the filing of a complaint by plaintiffs Barbara Jean Berry, et al., as parents of African–American children then attending the public schools of Benton Harbor, Michigan, against the School District of the City of Benton Harbor ("BHASD"), the members of its Board of Education and its Superintendent. In the complaint, the plaintiffs sought preliminary and permanent injunctive relief as to various acts and practices of the defendants, which plaintiffs deemed to be discriminatory or segregative. In July 1971, the district court found several practices carried out by the defendants to be constitutionally discriminatory. On November 1, 1974, the Sixth Circuit Court of Appeals affirmed the district court's findings that the practices were discriminatory and that plaintiffs had made out a prima facie case of *de jure* segregation.

On August 21, 1974 and September 25, 1975, plaintiffs added the following defendants to the case: the State of Michigan, the Attorney General of the State of Michigan, the Michigan State Board of Education, the Superintendent of Public Instruction (collectively, "the State of Michigan defendants" or "State"), the Boards of Education of the Eau Claire Public Schools ("Eau Claire") and the Coloma Community Schools ("Coloma"), and the Berrien County Intermediate School District and its Superintendent ("BCISD").

On August 22, 1977, following a trial on the liability of Benton Harbor Area School District (Phase I trial), the district court (then Chief Judge Noel P. Fox) ordered that the case be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. The class was identified as "all present and future students within the Benton Harbor Area School District." This class annually contains approximately 6,000 students. The court also found defendant Benton Harbor Area School District guilty of acts of segregation in violation of the United States Constitution.

On August 7, 1978, following a second liability trial (Phase II trial), the district court ruled against the State of Michigan defendants, the Berrien County Intermediate School District and its Superintendent, and the Coloma and Eau Claire School Districts and their Superintendents, finding that they had helped to create, perpetuate or contribute to the unlawfully segregated conditions in the Benton Harbor Area School District. The district court issued an amended order requiring the defendants found liable in Phases I and II to formulate a plan to remedy the constitutional violations.

In February 1980, the case was reassigned to the undersigned for remedial proceedings. Following a remedy trial, the court entered its Opinion and Order on May 1, 1981, adopting and ordering the implementation of a desegregation plan. In summary, this plan: (1) ordered the Eaman residential area be returned to the Benton Harbor Area School District; (2) enjoined the transfer of the Sodus II residential area from the Benton Harbor Area School District to the Eau Claire Public School District; (3) ordered the Benton Harbor Area School District to eliminate racially identifiable schools; (4) ordered the creation of magnet programs in the Benton Harbor Area School District; (5) ordered a voluntary program for interdistrict transfers of students between the Benton Harbor, Coloma and Eau Claire School Districts; (6) ordered further remedies relating to curriculum, faculty and staff reassignment and affirmative action goals, in-service training, student discipline, community involvement, monitoring and reporting, and for financing of the court's remedial plan. On January 24, 1983, the Sixth Circuit Court of Appeals affirmed the May 1, 1981, remedial order.

Certiorari was denied by the United States Supreme Court on October 11, 1983. *Berry v. School Dist. of the City of Benton Harbor*, 698 F.2d 813 (6th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983).

In September 1991, following ten years of implementation of the remedial plan, defendants Coloma, Eau Claire, BCISD and the State of Michigan filed separate motions requesting the court to terminate court supervision and control and to declare the school districts unitary. Thereafter, with the court's encouragement, the parties undertook settlement negotiations. In 1996, this court considered a proposed partial settlement between plaintiffs and defendants Coloma, Eau Claire and the State. Following a preliminary approval hearing, notice and a fairness hearing, I rejected the 1996 proposed partial settlement, concluding that it was neither fair, adequate nor reasonable. Subsequently, in June 1998, Coloma, Eau Claire, and the BCISD filed a joint motion to approve two partial settlement agreements, which were accepted as consent decrees by the court in August 1998 following a fairness hearing. If the parties comply with the terms of the consent decrees, Coloma, Eau Claire and the BCISD will be granted dismissal from this action at the end of three years following implementation of the settlement.

Many years after the remedial order was entered, the State of Michigan adopted a variety of changes to state education programs, including the implementation of a new method of funding local schools, the authorization of public school academies (charter schools), and the allowance of out-of-district students to attend district schools (schools of choice). The impact of these generally applicable state education changes on the remedial order has been the subject of a number of earlier opinions of this court.

In March 1996, the State petitioned this court to allow state school aid funding to be paid to Countryside Charter School, the first charter school attempting to open in the Benton Harbor School District (docket # 1006). Following review of the potential impact on the remedial order, the court denied that funding (docket # 1013). In April 1997, the State again petitioned the court to allow funding of Countryside (docket # 1076). Based on certain changes in the composition of the board, the students recruited, the specialized curriculum and certain assurances made by Countryside, together with annual reporting, the court permitted the funding of Countryside (docket # 1079).

In the spring 1998, two new charter schools, Pathfinder Charter Academy ("Pathfinder") and Benton Harbor Community Academy ("BHCA"), moved to intervene for the limited purpose of obtaining state school aid funding. Those motions to intervene were granted, but in an opinion and order issued on August 21, 1998 (docket 1217, 1218), the court denied without prejudice both Pathfinder's and BHCA's funding petitions. The court held that both charter schools had submitted insufficient evidence to enable the court to determine whether funding of the schools would undermine the court's remedial order or contribute to the resegregation of the Benton Harbor Area School District. Pathfinder filed a renewed petition on February 16, 1999 (docket # 1240). BHCA filed a renewed petition on April 21, 1999 (docket # 1258).

On April 23, 1999, yet another proposed charter school, Benton Harbor Charter School ("BHCS"), filed a motion to intervene in order to file a petition to permit state school aid funding (docket # 1261). Leave to intervene for a limited purpose was granted, and the petition was docketed April 29, 1999 (docket # 1269).

On April 21, 1999, the court heard oral argument on the renewed petition of Pathfinder. On April 26, 1999, the court determined that additional information was required to determine whether funding

should be permitted, and the court issued an order for limited discovery on the motion (docket # 1265).[1]

On May 12, 1999, following expedited briefing, the court heard oral argument on the petitions of both BHCA and BHCS. In an order issued May 14, 1999 (docket # 1298), at the request of the parties, the court ordered limited discovery from both BHCA and BHCS. The court reviewed proposed interrogatories and requests for production submitted by the opposing parties. The court directed which requests petitioners were required to answer and set dates for the filing of supplemental documents and briefs. The matter is now fully briefed and ready for decision, the court having received substantial supplemental documents and multiple briefs from all parties.

### DISCUSSION

The parties have raised numerous objections to the petitions to permit state school aid funding of the intervenor charter schools. The opposing parties contend that funding of any further charter schools in Benton Harbor will undermine the remedial order by preventing defendant school districts from meeting their obligations under the remedial order. The parties further contend that the particular charter schools have failed adequately to demonstrate that their programs will not have a detrimental effect on the remedial order.

### A. *Overall Considerations in Determining Whether to Grant Funding*

As in 1998, several of the objections to the petitions to permit state school aid funding of these intervenor public academies are based on policy concerns which are not properly matters within this

court's jurisdiction. For example, both the BHASD and the Michigan Education Association ("MEA") question the advisability and effectiveness of charter schools. As I have previously observed, however, this court has no authority to review the general advisability of charter schools. That question is properly reserved to the political process. The State of Michigan, through the legislative process, has enacted legislation permitting state-funded charter schools throughout the state. In addition, the court is without authority to evaluate the relative academic success of charter schools vis-a-vis their public-school regional counterparts. The general wisdom of these state policies is a political not legal issue.

Instead, in reviewing the petitions, the court is concerned exclusively with the potential impact state funding may have on the court's ability to remedy the defendants' past constitutional violations. That impact may be reflected in an interference with the present remedial order or in an effect on the court's ongoing ability to eliminate the vestiges of past discrimination. *See Missouri v. Jenkins ("Jenkins II")*, 515 U.S. 70, 89, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (scope of court's authority limited to remedial measures sufficiently linked to past constitutional violations); *see also Freeman v. Pitts*, 503 U.S. 467, 492, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992)).

However, the fact that political considerations regarding the advisability of charter schools are not properly before the court does not mean that the impact of charter schools on the defendant districts is irrelevant. In fact, as I observed in my initial decision denying funding to Countryside Charter School, the proposed funding of

---

1. Pathfinder subsequently determined that it would not continue to seek school aid funding in light of discovery costs, and therefore has moved to withdraw its petition for funding without prejudice (docket # 1327). The parties apparently have stipulated to voluntary withdrawal of the petition and documents are

being circulated at this time. For the reasons set forth in the motion to withdraw and in the absence of opposition, I GRANT Pathfinder's motion (docket # 1327) to withdraw its petition for funding without prejudice, and DISMISS Pathfinder as a limited purpose intervenor WITHOUT PREJUDICE.

charter schools by an adjudicated wrong-doer in this litigation makes it imperative that the court carefully evaluate whether the effects of such funding would interfere with any defendant's ability to implement the remedial order. At the same time, however, the court recognizes that, in the context of funding charter schools, which did not exist at the time of the remedial order, some of the objectives of the original remedial order have the potential to be in tension with others. For example, the court's stated objective in the remedial order to provide educational choices to class members may be in tension with the court's stated objective to provide opportunities for education in a desegregated environment and with the court's objective to remedy past educational deficits caused by segregated educational opportunity.

Similarly, the magnitude of the impact of funding multiple charter schools may raise issues not contemplated or experienced in funding a single charter school. As a result, the authorization of funding of multiple schools may have an impact on the remedial order where funding of a single small charter school, such as Countryside, was determined not to have such an effect.

As a result, consideration of the petitions for school aid funding requires the court to evaluate, to the best of its ability, the impact of such funding on all aspects of the remedial order, as well as the continuing ability of all defendants to eliminate the vestiges of past constitutional violations. Where the impact of charter school funding on various provisions of the remedial order may operate in opposing directions, the court must balance the potential effects and determine whether, as a whole, the remedial order will be unduly affected or whether conditions on such funding may provide adequate protections.

Accordingly, in evaluating whether to grant the petitions, the court must first consider the various components of the remedial order. In the instant case, the remedial order contained a number of pro-visions: (1) it enjoined property transfers and tuition students that could further segregate the Benton Harbor district; (2) it ordered pupils to be voluntarily transported and reassigned to different district schools to remedy past segregation; (3) it introduced magnet programs and interdistrict transfers; (4) it implemented provisions to remedy achievement and social skill deficiencies caused by the prior discriminatory educational treatment; (5) it ordered changes in the content of the curriculum to assure that materials were free of bias and to affirmatively include multicultural components; (6) it required reassignment of administrators, teachers and staff and affirmative action hiring to remedy past racially discriminatory practices; (7) it imposed in-service training requirements for teaching and administrative staff; (8) it imposed restrictions on discriminatory discipline and affirmative procedures for assuring consistent disciplinary practices; (9) it appointed an expert as court representative; (10) it created a community committee to monitor and help implement the program and to serve as a liaison between court and community; and (11) it set forth the means by which the requirements of the order would be financed.

Not all of these elements of the remedy are directly linked to the decision whether to approve funding of public school academies, entities which did not exist and were not considered at the time of the 1981 order. At a minimum, the court must consider the impact on integrated student populations, integrated faculties, staff and administration, composition of curriculum, and teacher in-service training in diversity. Evaluating how the public academy will meet its obligations in these areas, the court is interested in the composition of the student body, the faculty, staff and administration, and the charter school boards, the location of the proposed charter school and whether or not transportation will be provided. The court also is interested in the multicultural components

of the curriculum and planned in-service training.

Second, the court must consider whether the magnitude of any verifiable effects caused by funding public school academies in Benton Harbor will adversely affect the ability of the remaining defendants to meet their obligations under the remedial order. Such effects on the remaining defendants may include financial burdens affecting the ability of the districts to meet their remedial obligations to the remainder of the plaintiff class, as well as the ability of defendants ultimately to obtain unitary status and be released from this litigation.

■ The court acknowledges that in attempting to analyze these potential effects the court must demand substantial showings by intervenor charter schools, which require significant pre-approval investment beyond what would be required of charter schools operating in districts not subject to a desegregation order. However, these difficulties and expenses, while significant, are limited to the extent necessary to determine impact on the existing remedy. *Jenkins II*, 515 U.S. at 89, 115 S.Ct. 2038. So limited, these obstacles are neither unreasonable nor unfair. If the intervenor charter schools were private institutions or operated in non-defendant districts, the court would have no basis for interfering in the way in which these schools operated or recruited their students or staff. The court, however, both can and must assure that the defendant State of Michigan, which that has been adjudicated liable, may not, by funding these schools, have a detrimental effect on the efficacy of the remedial order.[2] In addition, the burden on charter schools who attempt to obtain funding from the State to operate in a district under a desegregation order, while different from public school academies in other districts,

is not different from the burden on other public schools in the districts subject to this court's remedial order. It is thus eminently fair and reasonable to impose such burdens.

### B. *Benton Harbor Community Academy*

Benton Harbor Community Academy has been authorized as a public school academy by Grand Valley State University, pursuant to Mich. Comp. Laws § 380.502–.503. BHCA proposes to provide academic services to 300 students in grades K through 8, and will be located, at least initially, at 281 South Fair Avenue in Benton Township. The BHCA intends to operate under a management contract with the Leona Group, L.L.C., which presently is managing a number of other schools in Michigan and Arizona.

The proposed location for BHCA is outside the city of Benton Harbor, in Benton Township. BHCA represents, as it did last year, that it intends to provide transportation to students attending its program. BHCA's present petition did not originally provide substantially more information beyond that submitted and rejected last year. Thereafter, in its reply brief, BHCA supplemented its initial filings with more information about the methods of recruitment and composition of faculty and administration. Subsequently, following court-ordered discovery and requests for supplemental information, BHCA has provided some additional information regarding staffing, and extremely limited information regarding student body composition.

■ In filing its renewed petition, BHCA declared that it could make no representations regarding student recruitment because applications were not being accepted until funding is approved.

---

2. The court acknowledges the State's denial of any attempt on its part to undermine the court's remedial order. The court does not intend to suggest that any action taken by the State in funding or in seeking funding for

public school academies is intentionally designed to undermine the remedial order. This court's concern, however, is not limited to the intent of any actions, but also must include the possible effects of such actions.

Thereafter, BHCA began to recruit students and the school provided preliminary information regarding 2000 flyers sent by BHCA to families within two miles of the school. Those fliers and initial recruitment, however, did not begin until May 28, 1999, and, therefore, BHCA has included in its supplemental materials almost no specific information regarding its student body. In fact, BHCA's only specific information concerning anticipated enrollments is limited to a list of fourteen students who have expressed interest, all of whom reside in Benton Harbor, including five children from one family and four children from another family. (BHCA Answers to Interrogatories and Requests to Produce (docket # 1332), Ex. 1.) The only applicants who have identified their race are African American.

In considering the renewed application of Pathfinder, and later in ordering additional submissions by BHCA, this court rejected the argument made by BHCA that proposed charter schools are not required to provide current student information before obtaining funding. The court directed both Pathfinder and BHCA to submit at least some additional information regarding their methods and results of student recruitment for 1999 (docket 1268, 1298). The court also allowed limited discovery concerning the composition of classes, faculty, and geographic distribution, together with questions involving whether the management organization had a racially biased retention history at its other facilities.

In reaching those determinations, the court expressly relied upon its earlier decision with respect to BHCA's 1998 petition for funding (docket # 1217). The court stated in 1998 and renewed that principle in the order for discovery in 1999 that "[i]n the absence of any evidence or statistics regarding this specific school, the court is unable to assess with any reasonable degree of certainty whether the funding of BHCA will result in a resegregation of a publicly funded school in the Benton Har-

bor Area School District." *See* Opinion Denying Petitions To Fund Charter Schools (docket # 1217), slip op. at 5. As the court acknowledged, the plan to offer school-provided transportation helps reassure the court that the school has the potential to attract a representative range of students from the entire district. "Nevertheless, in the absence of accurate reporting, the court has no factual basis on which to assess the likelihood of any resegregative impact in student assignment." *Id.* at 6.

The court's reasoning in 1998 continues to apply with at least equal force this year. Further, the implementation of a partial settlement in this matter raises new concerns regarding the potential impact on Coloma and Eau Claire, whose settlement terms were established to permit them to be released from this litigation in two more years upon proof of compliance with the terms of those agreements. Specifically, Coloma and Eau Claire have agreed to continue to allow present interdistrict transfer students to enroll in subsequent years and to operate as schools of choice for a number of students approximating the number historically enrolled in the interdistrict program. The geographic location from which BHCA will draw its students is therefore potentially significant to the ability of Coloma and Eau Claire to implement the remedial order as modified by the partial consent decree and to prove their compliance in order to obtain release from the litigation. Yet the court has absolutely no information from BHCA that would allow it to assess the magnitude of that impact.

Here, BHCA has failed to recruit students in a manner that would permit it to make any factually supported projections regarding the racial composition of its class or the districts from which students will be drawn. At this late juncture, the court is unable to assess the degree of potential impact on any of the defendant districts. Moreover, where the composition of the class is essentially unknown less

than two months before school is to open, the court is unable to conclude that any restrictions will provide sufficient information to the court or the defendant districts in sufficient time for the opening of this school year. In the face of last year's decision and in the absence of virtually any new information from BHCA regarding various aspects of student composition, the court must once again conclude that it has insufficient information to determine whether BHCA will detrimentally affect those portions of the remedial orders of this court involving student assignments, resegregation, and compliance with the partial consent decree.

In light of this conclusion, the court need not discuss in detail the remaining considerations before the court in evaluating the potential impact of funding of BHCA on the remedial order.[3] The court also need not consider what impact (both individually and collectively with other charter schools) the funding of BHCA would have on the ability of the BHASD to remedy its past discrimination.

Moreover, the court need not consider whether other court-imposed restrictions on student body composition could adequately address these concerns. BHCA had clear direction from this court in the 1998 order that specific information regarding student body composition was required. BHCA elected not to pursue such information, filed a late-season renewed petition, and now, in early July, is faced with virtually no information regarding its anticipated class. Without better information, the court declines to authorize the State to fund a public school with the potential to impose such risks to the remedial order and to the defendants' abilities to eliminate the vestiges of past discrimination.

As I stated previously, in attempting to receive public school aid funding from an adjudicated defendant in a district operating under a desegregation order, BHCA is under greater obligations than public school academies opening in other districts because the State itself is under such obligations. It is not sufficient for such schools to rely upon general state-wide authorization for charter schools as authorization to open in a district subject to a desegregation order.

### C. *Benton Harbor Charter School*

■ Benton Harbor Charter School has been organized as a public school academy under Mich. Comp. Laws § 380.501–.507, and has been authorized by Ferris State University, pursuant to Mich. Comp. Laws § 380.502–.503. BHCS initially proposes to serve 540 students in grades K through 5, with the intention of adding one grade each year until the school serves approximately 1180 students in grades K–12. The school will be located, at least initially, at 455 Riverview Drive in Benton Harbor. The BHCS intends to operate under a management contract with Advantage Schools, Inc., which presently is managing a number of other schools in Michigan and the nation.

In support of its petition, BHCS apparently has reviewed this court's prior decisions and has directed its responses to the areas of court concern discussed in the August 21, 1998 opinion denying petitions to fund charter schools.

### 1. Student Recruitment

In support of its contention that funding of BHCS will not undermine the remedial order or prevent elimination of the vestiges of past discrimination with respect to student recruitment, BHCS has introduced a variety of evidence. First, BHCS has expressed its intent to provide transportation to all students within the BHASD, as well as transportation from various sites outside the BHASD. As I previously have noted, such transportation plans help as-

---

3. Although the court does not discuss the remaining factors, the court observes that BHCA's submissions on at least some other points of court concern, such as faculty and staff recruitment, are substantially more complete than those made last year.

sure that the simple location and financial status of area residents will not by themselves result in a segregated school. Nevertheless, as noted with respect to BHCA, the provision of transportation is not itself a sufficient assurance that the school will not have a resegregative effect on the district.

In further support of its petition, BHCS has documented its specific efforts to recruit students. Submissions by BHCS show that the school placed advertisements in the *Herald–Palladium* and *Tri-City Record* and ran radio advertisements on three local radio stations. (Third Branscome Affidavit ¶ 14 and Ex. B, C.) BHCS also directly mailed enrollment information to 2400 households in St. Joseph, Coloma, Eau Claire, Sodus and Watervliet. (First Branscome Aff. ¶ 18.) In addition, BHCS established a toll-free parent hotline to answer questions and provide information. (First Branscome Aff. ¶ 16.) Further, BHCS has hired a local recruiter, distributed 5,000 flyers and 2,000 promotional packets at the Benton Harbor Blossom Festival Parade, and held an informational open house in Benton Harbor. (Second Branscome Aff. ¶¶ 8–10; Third Branscome Aff. ¶ 15.) In addition, BHCS presently is in the midst of a door-to-door recruitment effort during which it expects to distribute 10,000 flyers about the school. (Second Branscome Aff. ¶ 10.)

As a result of these recruitment efforts, BHCS is able to provide the court with more specific information regarding the expected composition of its class. As of June 14, 1999, BHCS has received 326 applications for enrollment. Ten of those applications are from students who currently attend school in Coloma, and none from current students in Eau Claire. Of the 258 of these applicants who identified their race, all but three students are black. Of the total 326 applicants, 318 are residents of the Benton Harbor Area School District, 218 of whom attended BHASD schools in 1998–99, and 52 more of whom did not disclose where they previously attended. Of the 218 known to have attended BHASD, BHCS has provided information concerning the specific schools from which those students have been drawn.

This information regarding student body provided by BHCS is substantially more precise and helpful to the court in assessing the magnitude of the impact on the racial compositions of defendant districts and on the districts' ability to continue to meet their obligations under the remedial order than was the information presented by BHCA. However, the information is neither uniformly favorable nor unfavorable.

The data suggest that, as of this time, the funding of BHCS will not have an immediate or drastic impact on either Coloma's or Eau Claire's obligations under the partial settlement. At this time, only ten of the 483 interdistrict transfer students attending Coloma have expressed an interest in attending BHCS. While the court understands Coloma's concern with its ability to demonstrate compliance with the partial settlement in two years, I am not persuaded that the district is at risk of either being found non-compliant or having proof of compliance made difficult simply because a charter school has drawn off this relatively small portion of the transferring student body. Moreover, a change in ten students should not have any statistically significant resegregative impact on Coloma.

Within the BHASD, in contrast, the available data suggest that the funding of BHCS without restriction has the potential to have a resegregative effect on the district. Virtually all of the applicants to BHCS are African American. In light of this court's earlier findings of discrimination by both Benton Harbor and the State of Michigan, and considering the primary goal of the remedial order to provide class members with enhanced, integrated educational opportunities, this court is greatly concerned with the potential introduction of a state-funded, one-race school in the Benton Harbor district. Such a result

would be in direct conflict with the primary objectives of the remedial order and the cornerstone of the court's jurisdiction—the elimination of segregation and other continuing effects of past discrimination. *Berry v. Sch. Dist. of City of Benton Harbor*, 515 F.Supp. 344, 367–68 (W.D.Mich.1981) (noting two-part purpose of the interdistrict remedy: (1) permitting greater numbers of BHASD students to be educated in desegregated environments; and (2) providing increased opportunities to BHASD students for quality educational experiences). The 1981 remedial order provided for the elimination of single-race schools precisely because of findings that BHASD had an intentional past practice of segregating students and that the State condoned and perpetuated such segregation. *See Berry*, 515 F.Supp. at 348–49. As a result, allowing the State to fund a single-race school in the BHASD would be at direct odds with a central purpose of the remedial order.

The court's concern that BHCS may become a single-race school is somewhat heightened by the profile of student populations in other schools operated by Advantage Schools. In Exhibit H to its petition for funding (docket # 1269), BHCS sets forth the racial composition of other Advantage-operated charter schools. In response to the court's request for population information regarding the surrounding communities, BHCS also has provided comparison data. (Exhibit C to BHCS Memorandum in Response to the May 14, 1999 Court Order (docket # 1328).) Those data reflect a dramatic disparity between the racial composition of particular schools and the composition of their surrounding communities, usually involving a substantially higher percentage of minority students than are present in the geographic area. In some schools, such disparities have resulted in nearly inverse proportions between the student population and the general population of the community. *See, e.g.,* Jersey City Advantage Charter (where surrounding community has 65% white population within two-mile radius,

school is 70% black with no non-hispanic caucasian students); Kalamazoo Advantage Charter (where surrounding community has 68% white population within two-mile radius, school is 71% black and 24% white). While the experiences at other Advantage schools are not dispositive of this case, these statistics suggest that the court's concerns based on present data about BHCS class composition are neither unexpected nor unique.

Taken together, I am persuaded that the portion of the remedy involving student assignments and resegregation is at risk if BHCS is allowed to be funded by the State without restrictions. I do not conclude, however, that denial of BHCS' petition is the appropriate response to this concern. This court must limit its exercise of jurisdiction to those orders necessary to remedy defendants' past discrimination and to protect its remedial order. *See Jenkins I,* 495 U.S. at 51, 110 S.Ct. 1651. The court must take care in the exercise of its equitable power to have appropriate respect for the integrity and function of local and state law. *Id.* Considerations of comity must constrain intrusions on that authority not made necessary by the court's remedial responsibility. *Id.*

With respect to the court's concern about student body composition, I am persuaded that the court may meet its concerns without completely denying the operation of an otherwise-authorized public education alternative. In other words, I am persuaded that reasonable restrictions on student body composition will permit BHCS to be operated without undermining the remedial order. Necessary restrictions will be discussed in detail later in this opinion.

## 2. Faculty and Staff Recruitment

With respect to faculty and staff recruitment, BHCS has identified a wide range of recruitment activities. It has placed half-page advertisements across the state in the following periodicals: *Tri–City Record, Herald–Palladium, Michigan Chronicle,*

*Detroit Metro Times, Michigan Citizen, Detroit News and Free Press,* and *Kalamazoo Gazette.* (*See* Third Branscome Affidavit ¶ 4 & Exhibits A–C.) The advertisements have been directed at periodicals reaching a variety of audiences within the state: general statewide populations, local communities, communities with substantial African American populations and newspapers with substantial African American readerships. (Third Branscome Aff. ¶ 5.) In addition, radio advertisements used to recruit students also advertised available teaching positions and provided a separate toll-free number for. inquiries. (Third Branscome Aff. Ex. D.)

Further, the school collaborated with local community groups including the Urban League, Cornerstone Alliance and Michigan Works to hold a career forum on March 22, 1999 at Lake Michigan College to recruit staff for the BHCS. (First Branscome Aff. ¶ 25.) It subsequently participated in another career forum at Lake Michigan College on June 9, 1999. (Third Branscome Aff. ¶ 9.)

In addition, Advantage notified all college and university recruitment offices in Michigan of available job openings and attended an educator's forum at Calvin College in Grand Rapids at which a number of southwest Michigan universities were represented. (First Branscome Aff. ¶ 27; Second Branscome Aff. ¶ 5.) Advantage also participated in the National Minority Careers Exposition in New York, a forum attended by 1500–2000 minority educators. (Second Branscome Aff. ¶ 6.)

As a result of these recruitment efforts, BHCS has been able to make the following specific representations regarding its· faculty and staff: (1) it has made job offers (contingent on receiving court approval of funding) to three classroom teachers, two of whom are white and one of whom is African American, although the African American teacher has since had to withdraw because funding was not yet in place; it has made a job offer to a music teacher, who is African American; (3) it has made six offers to instructional assistants, all of whom are African American; and (4) none of the job candidates is presently employed in any defendant school district. (Third Branscome Aff. ¶¶ 10–11.) In addition, BHCS has directed the court to the racial composition of administration, faculty and staff at other Advantage schools. (First Branscome Aff. ¶¶ 28–29 and Ex. H.) These materials show that while the composition varies from school to school, the overall profile of administrative and instructional staff is reasonably diverse.

Taken together, I am persuaded that BHCS is making substantial efforts to recruit and hire a diverse faculty and that it is having reasonable success in meeting its goals. Moreover, BHCS has not targeted employees at any defendant school district and to date has not drawn teachers or staff from those districts. While the court must have at least some specific information about staffing, together with a detailed record regarding methods of recruitment, the court has never suggested that complete hiring information is a prerequisite to funding. In this case, although hiring is far from complete, I am persuaded that no evidence suggests that funding of BHCS will undermine the court's remedial goals with respect to faculty and staff composition in Benton Harbor, Coloma and Eau Claire. I am further persuaded that present evidence does not suggest that BHCS will offer a resegregated teaching environment at a publicly funded school in Benton Harbor. Accordingly, I conclude that with appropriate continuing reporting requirements, faculty and staff considerations should not bar funding of BHCS.

### 3. Curricular Requirements

BHCS has submitted detailed information regarding its curriculum. (Madigan Aff. ¶ 3 and Ex. A, B, C.) That information reflects substantial inclusion of a wide range of social, cultural and ethnic perspectives in literature, music, history, politics and science. No party has suggested that the content of the BHCS proposed curriculum requires amendment, and the

court is persuaded that the curriculum as described will promote an appreciation for cultural differences and diverse populations. Accordingly, the BHCS curricular components do not appear to contravene the remedial order.

#### 4. School Board Composition

According to the information provided by BHCS in its petition and supporting documents, the charter school board of BHCS presently consists of seven members, all of whom are African–American. BHCS states in its submissions to this court that a parent member will be added after the school is operational. In addition, BHCS represents that as a means of adding diversity to the school board, a ninth board position will be added and filled by an individual from a different racial background. (First Branscome Aff. ¶ 32.)

As the court noted in its earlier opinion denying funding for BHCA and Pathfinder, the fact that the board of directors for the school may be composed of members of only one race is of concern to the court, inasmuch as the remedial order is designed to eliminate racially identifiable schools within the BHASD, regardless of race. The court previously observed that an all-African American board would suggest that the school will not operate as a state-funded predominantly white school in a majority African American school district. Nevertheless, particularly in the context of the present single-race student population, the court remains concerned about the possibility of approving any single-race school in this district. School board composition, therefore, remains a modest factor in evaluating the impact of BHCS on the remedial order.

#### 5. Diversity training of faculty, staff and board of directors

BHCS has declared its intentions to provide diversity training to faculty, staff and board members, and represents that it presently is looking for a vendor of such services. (First Branscome Aff. ¶¶ 30, 33.)

The court believes such training is both necessary and appropriate and that BHCS will provide services as it has represented. The court therefore is persuaded that, with follow-up reporting, this aspect of funding BHCS should not impermissibly affect the remedial order.

#### 6. Other considerations

In addition to specific areas of concern regarding the composition of the programs, staffing and student body of BHCS, the parties have raised additional concerns regarding the impact of BHCS on the court's remedial order and the defendants' abilities to remedy past discrimination. The BHASD has identified several effects that funding of all charter schools may have on the BHASD. Specifically, BHASD contends that the combined BHASD-resident student population for all charter schools expected in the first year may amount to 25% of the overall student population of the BHASD. The loss of only 500 students to BHCS would result in the loss of more than $2,500,000 of the operating budget of the BHASD. The BHASD contends that such drop in revenue would result in a loss that could not be offset by any concomitant reduction in operating expenses because BHASD will not know which students are attending new schools before the beginning of the school year, and will not be able to adjust its number of teachers, classroom and school assignments and transportation requirements to offset those reductions in the number of students. As a consequence, BHASD contends that the revenue must be considered to be a reduction in revenues that will not be offset by reduction in expenditures.

As a related consideration, BHASD contends that one of the primary purposes of the remedial order was to improve the quality of student education in Benton Harbor, a concern that will be undermined by diverting funding to another public school. As a result, BHASD asserts that the funding of charter schools in Benton Harbor, without substitute compensation

as ordered with respect to the interdistrict program, is in direct conflict with the goals of the remedial order.

In 1981, when imposing an interdistrict remedy on all defendants found guilty of discrimination, the court concluded that substantial costs should be borne by the State to compensate each district that would lose students under the interdistrict and magnet portions of the remedial order. The court specifically concluded that districts might fail to actively encourage students to participate in the interdistrict remedy if they stood to lose state financial aid. *Berry,* 515 F.Supp. at 385. Thus, the continuity of state funding was seen as a necessary corollary to viable interdistrict and magnet programs. The funding, therefore, was deemed necessary to assure the fulfillment of the .transfer programs and the districts' cooperation with those programs. The court did not, however, conclude that all costs to a defendant district caused by any student choices .should be eliminated. For example, the court provided no remedy to any school district for a student or parent's choice to leave the ·district or to attend a private institution. Instead, the provision of extra educational dollars to the district losing transfer students was limited to the amount necessary to achieve the remedial goal of a successful voluntary transfer program.

■ The provision of economic aid to districts for each student electing to attend charter schools would not rest on the same supporting rationale. Unlike with its .remedy, the court has no interest in either promoting or· discouraging district cooperation with the new charter schools. Further, while the· 1981 remedial order contemplated improving the quality of educational programs that resulted from the illegal discrimination, the court's role in assessing the quality of educational programming is limited to the narrow purpose of remedying past discrimination, and the court retains no authority to impose its views of educationally superior programs not directed to that remedy. *See Jenkins*

*II,* 515 U.S. at 89, 115 S.Ct. 2038 (scope of court's authority limited to remedial measures sufficiently linked to past constitutional violations).

■ It remains true that if state funding of charter schools, either by its nature or its magnitude, would have the effect of interfering with the ability of any other defendant to meet its obligation under the remedial order, that funding would itself undermine the order. As a result, the degree of impact that funding BHCS may have on the other districts may be sufficient for the court to deny the request for funding.

At the same time, however, the court must recognize that the 1981 remedial order had a separate goal of expanding and enhancing choices for desegregated quality education in the defendant districts. BHCS unquestionably offers another option to Benton Harbor· students that, if sufficiently integrated, could serve that goal. The question, ultimately, is whether the impact on the ability of the BHASD to provide desegregated educational opportunities to its students will be sufficient to warrant the court ignoring any such alternative.

In light of the court's denial of the petition of BHCA, the projection of BHASD that it will lose 25% of its students in the first year is overstated. If BHCS successfully recruits the maximum students it seeks in the first year (540 students), and assuming all of those students will be drawn from residents of the BHASD, the number would represent less than 10% of the total 5900 students in the district. Even combined with the proposed enrollment of Countryside of 350 students in 1999–2000, the total of 890 students would represent approximately 15% of the district's student population. That figure again assumes that all students attending Countryside and BHCS will be drawn from resident students who were or would have attended the BHASD had these charter schools not existed. In fact, however,

Countryside's initial enrollment included a substantial number of students who were not previously attending school in the BHASD. *See* Order of April 29, 1997 Granting Petition to Permit Funding of Countryside Charter School (docket #1979) at pp. 1–2 (identifying 64 of 109 applicants as students either not residing in Benton Harbor or not attending BHASD schools). The preliminary information from BHCS suggests that at least some additional number of BHASD-resident applicants to BHCS previously attended non-BHASD elementary options (not including those who previously attended only pre-school options). (Third Branscome Aff. Ex. F.)

Assuming the worst for purposes of argument, however, the potential number of students is substantial. However, I am not persuaded that the numbers would significantly hamper the ability of the BHASD to meet its obligations under the remedial order as a matter of law. Moreover, while I recognize the difficulties in projecting expenditures for the next fiscal year, I am not persuaded that the size of the loss to the district is certain at this time. The BHASD, with regular supplemental information concerning which students have enrolled at BHCS, should be able to achieve savings in classroom teachers needed, buses operated, and in the most extreme scenario, buildings operated.

BHASD suggests, however, that BHCS, by waiting until so late in the year to bring their petitions, has manufactured a time frame that will itself will be detrimental to the district and should bar funding. I note, however, that Benton Harbor and other defendants simultaneously seek detailed information about recruitment of students and staff in the upcoming school year, which necessitates a relatively late filing by any prospective charter school. As a consequence, the objection of the BHASD would place any potential public school academy in a Catch–22, in which it could not file and the court could not grant funding petitions too early because it would not have detailed information, but any decision made late enough to consider such information would impose an ostensibly impossible burden on the BHASD in responding to the loss of students late in the season.

As a result, while I am concerned about the impact of the funding of charter schools on the ability of the BHASD to fully comply with the remedial order, I am persuaded that the concern should not be an absolute bar to such funding. Some remedial benefits to the district may be obtained in terms of reduced class sizes or overhead reductions. Further, the choice presented to class members serves another objective of the remedial order that is in counterbalance to the lost revenue.

I therefore conclude that the risks to the ability of the BHASD to meet its obligations under the remedial order are not sufficiently clear to warrant ignoring the potential opportunity desired by some members of the plaintiff class, as long as those risks may be minimized by appropriate limitations, which shall be addressed later in this opinion, such as requiring BHCS to provide regular updates regarding its applicants and enrolled students, including the school presently being attended by each, to prevent unreasonably unpredictable results to the BHASD.

Both the BHASD and the Michigan Education Association ("MEA") next contend that the failure of charter schools to fully meet the needs of special education students will result in an increased financial burden on the BHASD by leaving more of its students requiring higher cost programming, while "skimming" those students in the district who are cheaper to educate. Again, however, while some charter schools may have had a policy of discouraging special education students, the court has no factual basis for concluding that BHCS will operate in that fashion. BHCS is obligated under state and federal law to provide special education services as needed, and it has expressed its intent to

meet those obligations. Madigan Aff. ¶ 4; Second Branscome Aff. ¶¶ 18–19.

Further, BHCS has submitted information regarding the numbers of students receiving those services in other charter schools operated by Advantage. Third Branscome Aff. ¶ 25 & Ex. K. That information demonstrates that 317 of 3890 students in reporting Advantage schools receive special education (8.1%). At Kalamazoo Advantage Charter School, the only other Advantage school in Michigan (which has only been in operation for one year), 26 of 362 students receive special education services (7.2%). BHASD represents that 483 of its 5900 students receives special education services (approximately 8.2%). Thus, on the information available to the court, Advantage schools appear to be educating a comparable percentage of students with special education needs to those being educated by the BHASD. In light of the documentation provided by BHCS, the court cannot conclude that the funding of BHCS will adversely affect the balance of special education and general education students and result in a financial deficit to the BHASD.

Finally, the BHASD has suggested that some charter schools have had a student retention record that is disproportionate by race. The BHASD contends that disproportionate retention at BHCS could have an impact on the desegregation components of the remedy. BHCS, however, has submitted retention statistics at other Advantage schools, and, to the extent information is available, no discrepancy in retention rates by race appears to exist. (Third Branscome Aff. ¶¶ 21–23.) I therefore conclude that retention concerns do not appear to have the potential to impact the remedial order at this time.

Having addressed each of the parties' concerns and the areas of potential impact on the remedial order, I am persuaded that, with appropriate restrictions, funding of BHCS will not significantly interfere with this court's 1981 remedial order. In the interests of comity and of providing educational choice and opportunity in Benton Harbor, I am persuaded that such funding should be granted, with restrictions as set forth below.

### 7. Restrictions

As previously noted, the court has substantial concerns regarding the potential impact on the remedial order of the composition of the BHCS student body. Based on present information, by authorizing funding without restriction, the court would be permitting an adjudicated constitutional violator in a race discrimination action to fund a single-race school within a co-defendant district operating under a desegregation order. Such a result is in direct conflict with the remedial order, which attempted to remedy past segregative intent by eliminating racially distinct schools. The court, therefore, is faced with determining what restrictions on student recruitment, together with further reporting requirements, may adequately protect the remedial order while still permitting funding of the BHCS.

In order to protect the remedial order, plaintiffs ask the court to impose a limitation on the number of pupils that may be drawn from the resident population of the BHASD. Plaintiffs suggest that the BHCS should be limited to accepting not more than 75% of its students from pupils who reside in the BHASD, with the remainder to be drawn from pupils who reside in other school districts. Plaintiffs assert that this limitation is reasonable because it parallels the limitations placed on the magnet schools established under the remedial order. *See Berry,* 515 F.Supp. at 366.

I disagree. In the 1981 remedial order, the court directed that magnet schools be established to encourage white students from Coloma and Eau Claire to attend Benton Harbor schools and thereby desegregate student populations in all three districts. The court anticipated that 10% to

25% of the students participating in magnet programs would be drawn from students participating in the interdistrict transfer program. The court therefore reserved 75% of the enrollment capacity for residents of the district in which the magnet program was located. The court did not, however, mandate that 25% of students in the magnet program be residents of other than the home district. *Id.* Plaintiffs' proposal, therefore, would place stricter enrollment restrictions on the BHCS student body than on magnet schools in districts which have been adjudicated to have engaged in past constitutional violations. In addition, the remedial order never attempted to require the entire BHASD to include 25% students from Eau Claire and Coloma, but only those schools operating as magnets. Therefore, were the court to impose a 25% requirement on BHCS, it would be imposing requirements on BHCS as if it were a particular component of the BHASD, rather than a school operating in the district generally.

Moreover, in the original remedial order, the limitations for magnet schools were designed as a partial remedy imposed on all of the participants in the past discrimination, rather than only one defendant. As a result, this component of the order was intended to desegregate vastly more racially disparate areas than presently exist in Benton Harbor alone, and it did so by means of a program that provided incentives for voluntary transfers. Here, the court remains concerned about resegregative impact on all defendant districts, but on the facts before the court, that potential impact appears real for the BHASD alone. I therefore am not persuaded that any reason exists for treating BHCS as a magnet school under the remedial order.

In addition, the court must be concerned about placing any unnecessary burden on non-defendants that is not required to enforce the remedial order. The original order imposed no independent burden on a party not previously found guilty of constitutional violations. It is true, of course, that the State, who will be funding BHCS, is a defendant with adjudicated liability, and it is this fact that most strongly authorizes this court's jurisdiction over charter school funding. Nevertheless, BHCS itself has not been so adjudicated, and the court must be concerned about placing greater-than-required restrictions on non-defendants.

■ Further, as I previously have stated, the court remains obligated to limit the exercise of its jurisdiction to those orders necessary to remedy defendants' past discrimination and to protect its remedial order. *See Jenkins I*, 495 U.S. at 51, 110 S.Ct. 1651. The court must have appropriate respect for the integrity and function of local and state law, and considerations of comity must constrain restrictions on those laws which are not necessary in meeting the court's remedial responsibilities. *Id.*

Taken together, I am not persuaded that it would be appropriate to impose a requirement on BHCS that it draw 25% of its students from districts other than the BHASD. Nevertheless, I remain concerned about the potential of allowing the State to fund a new single-race public school in Benton Harbor, and I am persuaded that funding of such a school without some limitations on student enrollment would undermine the remedial order.

BHCS contends, however, that it should not be required to do more than demonstrate that it is within the outside limitations imposed on the BHASD under the remedial order. It asserts that under the remedial order, the BHASD was required to do no more than demonstrate that racial composition at an individual school building came within 10% of the overall district composition. BHCS asserts that, because the BHASD student population is now 90% African American (89% in grades K–5), it would meet the mandate of the remedial order if its population were nearly 100% African American. *See* Michigan Dep't of

Educ.1998–99 Pupil Headcount Report (from September count) (showing that 5298(90%) of 5909 students were African American in 1998–99; 3022(89%) of 3395 K–5 students were African American in 1998–99). *See also* First Branscome Aff. Ex. C (showing that in 1997–98, 2966(88%) of 3358 students enrolled in K–5 grades were African American).

I disagree. The remedial order expressly disavowed rigid student ratios on the Benton Harbor district in determining district student assignments. Nevertheless, the court anticipated that in most circumstances the variation between schools would be less than ten percent of the overall district percentage. *Berry,* 515 F.Supp. at 361. Further, the court expressly admonished the district that the goal was to create a student population that was racially mixed in accordance with the overall student body. *Id.* at 360 ("Elimination of racial identifiability of schools can most simply and consistently be achieved by the school district by using a guideline based on the racial composition of the district as a whole.")

In addition, the remedial order was addressed to the relative balance in student assignments *within the BHASD*. The order simply did not contemplate the introduction of a new, publicly funded, single-school, school district within the BHASD, yet separate from it. Unlike the BHASD, BHCS is not *assigning* students to different school buildings, but instead is attracting a single student body to a single school building.

Therefore, while the court acknowledges that BHCS does not directly parallel magnet schools, neither does it directly parallel the BHASD in determining pupil assignments. As a result, limitations on BHCS pupil ratios cannot be drawn directly from either portion of the remedial order. Instead, rather than the language of the remedial order itself, it is the nature of the potential impact on the remedial order that must direct the court's response. I therefore am persuaded that the court's concern with the potential for resegregative impact occasioned by the funding of a single-race school must govern the scope of any limitation.

With that consideration in mind, I conclude that it is appropriate to make funding of BHCS contingent on the school's racial balance approximating that of the BHASD district as a whole. BHCS must supplement its recruitment efforts in an attempt to attract a student body that closely parallels the 90% African American population of BHASD as a whole. Funding will not be subject to withdrawal on this ground if the student body comes within five percentage points of this number and BHCS documents good faith efforts to achieve the 90% composition.

BHCS asserts in its briefing that it is prohibited under the Michigan Public School Academy Act from restricting admission either on the basis of district of residence or on the basis of other criteria that would be illegal under Michigan Law, including race. *See* Mich. Comp. Laws § 380.504. It therefore suggests that, under Michigan law, it would be unable to comply with restrictions on enrollment that may be set by this court.

■ I disagree. A federal court has the authority " 'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " *Pennsylvania Bureau of Correction v. U.S. Marshals Serv.,* 474 U.S. 34, 40, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985) (quoting *United States v. New York Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). That power "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *New York Tel.,* 434 U.S. at 174, 98 S.Ct.

364. Here, where BHCS receives its authorization from state law and where the State was a defendant in this action, BHCS's right to exist and to be funded is subject to preexisting limitations on the State to grant that authority.

■ Ultimately, the real question before the court is whether the State has the authority to fund BHCS in Benton Harbor, not whether the BHCS has a right to exist generally under applicable state law. The federal courts routinely have recognized that where a state and a school district have engaged in racial discrimination, generally applicable state law is not enforceable to the extent it prevents implementation of the remedial order of the court. *See Missouri v. Jenkins,* 495 U.S. 33, 57, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990); *North Carolina State Bd. of Educ. v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) ("[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees."). *See also United States v. Bd. of Educ. of City of Chicago,* 11 F.3d 668, 674 (7th Cir.1993) ("The state—the violator, the joint tortfeasor—could not disable its accomplice from compliance with the remedial decree.").

As a consequence, this court has authority to limit, to the extent necessary to protect its remedial order, the funding of charter schools in the Benton Harbor district. Restrictions found necessary by this court to protect the remedial order must take precedence over contrary state law, particularly where that law was enacted well after the State became obligated by the remedial order. As a result, this court's determination that funding should be contingent on the existence of a student body with a racial composition roughly equivalent to the population of the district in which it opens is both lawful and proper, as well as fair whenever a charter school such as BHCS opens in a district operating under a desegregation order.

Plaintiffs next seek a restriction requiring BHCS to obtain this court's approval annually before adding a new grade. BHCS objects on the grounds of excessive costs and uncertainty that would be created by such approval process. BHCS also notes that the court has not required such approval process as part of the continued funding of Countryside.

I agree with plaintiffs that the circumstances of the present petition are substantially different than those presented by Countryside. The court approved Countryside at a time when it was the sole charter school proponent and when Countryside was able to come to agreement with plaintiffs regarding restrictions on the school's operation. In addition, and central to the court's determination at that time, Countryside offered a unique substantive curriculum not available in Benton Harbor or the other school districts and Countryside proposed to enroll a relatively small number of students. BHCS, standing alone, proposes over the next six years to expand to serve approximately 20% of the students of the BHASD. The size of the potential impact on the remedial order warrants heightened concern by the court to assure that the school will not undermine the order.

As plaintiffs observe, the court has never suggested that by authorizing funding, it has relinquished its authority to consider whether funding should be continued in future years. To the contrary, Countryside understood from the outset that it needed this court's approval to receive funding. Continued funding remains contingent on Countryside making regular reports to the court as ordered and continuing its efforts to provide an integrated educational opportunity that does not undermine the remedial order. Either on the court's own motion or on motion of another party, the court could reconsider funding if Countryside fails to operate in a manner consistent with the remedial order.

Despite these differences, however, I am not persuaded that BHCS should be re-

quired at this time to re-petition the court whenever it seeks to expand the grades being served, as long as that expansion does not exceed the planned expansion set forth in the petition. Instead, I conclude that by directing BHCS to meet certain recruitment standards and other conditions of compliance with the remedial order, and by ordering BHCS to submit timely information regarding its program, the court and parties will be in a position to monitor any impact on the remedial order and to move to enforce both the remedial order and this order, if necessary.

With respect to the impact the funding of charter school may have on the ability of the BHASD to remedy the vestiges of past discrimination, I conclude that further appropriate restrictions also need be imposed to protect the remedial order. In particular, I am satisfied that BHCS must report timely the names of those students who have applied or enrolled with BHCS in order to enable the BHASD to prepare most effectively and economically to any student losses. Accordingly, between now and the opening of the school year, BHCS shall provide weekly updates to the BHASD regarding student recruitment, including names, addresses, grades and previous schools attended for all applicants and admitted students who reside in the BHASD. Further, BHCS shall submit regular, but less frequent, reports to the court and all parties as further directed in this order so that the court is apprised of the potential impact.

In addition, approval of state school aid funding for BHCS shall be contingent on continuing good faith efforts to recruit diverse faculty, adding a board member of a race other than African American, as promised in the petition, and providing diversity training to board members, faculty and staff, as promised in the petition. In addition, BHCS shall, as hereinafter set forth, provide interim reports to this court between now and September 21, 1999, and shall file annual reports to the court similar to those provided by defendants. Finally, the court will require BHCS to operate in a manner consistent with the remedial order and to work with plaintiffs on such future concerns and issues as may arise.

## III. CONCLUSION

For the foregoing reasons, the renewed petition of Benton Harbor Community Academy for state school aid funding (docket # 1258) is DENIED WITHOUT PREJUDICE for lack of sufficient information. The petition of Benton Harbor Charter School for state school aid funding (docket # 1269) is GRANTED, subject to the following restrictions:

1. BHCS shall continue active recruitment in an effort to obtain a student body of approximately the same racial composition as that of the BHASD as a whole, which is presently 90% African American, and BHCS shall submit reports to the court with copies to all parties on July 21, 1999, August 21, 1999 and September 21, 1999, setting forth the number, race, district of residence and prior school attended (naming the district and, if in Benton Harbor, the school building) for each applicant and enrollee.

2. BHCS shall provide weekly reports to the BHASD between the date of this order and the opening of the school year identifying by name, address, grade and prior school of enrollment all applicants and enrolled students at BHCS who reside in Benton Harbor.

3. BHCS shall continue active recruitment of a diverse faculty and staff and shall submit reports to the court with copies to all parties on July 21, 1999, August 21, 1999 and September 21, 1999, listing by race and job classification the numbers of positions offered to and accepted by prospective faculty and staff. The reports shall also list whether any recruited faculty or staff has been working for one of the defendant school districts.

4. BHCS, as promised in its petition, shall add a new regular board member from a different racial background than the present seven African American board members, as well as a parent board member. BHCS shall invite class representatives to make nominations for future board openings.

5. BHCS shall provide diversity training to its school board, faculty and staff on an annual basis.

6. BHCS shall work with class representatives on such future issues and concerns as may arise.

7. At the end of each school year, and not later than June 30 of that year, BHCS shall file an annual report with the court, with copies to counsel, comparable to reports filed by defendant school districts as set forth in the remedial order, found at *Berry v. Benton Harbor*, 515 F.Supp. 344, 384–85 (W.D.Mich.1981), but including only the following items listed in pp. 384–385: ## 1, 2 (first clause only), 3, 6, 7, 8, 9, 10, 11 and 12 (also describing training for school board members). In addition, BHCS's annual report shall contain the following information:

a. A current report of applications and enrollment of students for the next school year, containing the information described in paragraph 1 of this order.

b. A current projection of faculty and staff for the next school year as described in paragraph 3 of this order.

c. A list of all school board members showing the race of each.

d. A list of the number of students receiving special education services showing the category of services provided, whether the services were provided at BHCS or another site, and the approximate number of hours of services provided to each student per week.