# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2018

Lyle W. Cayce
Clerk

No. 17-30548

VERNON SMITH on behalf of IRMA J. SMITH,

> Plaintiff

UNITED STATES OF AMERICA,

> Intervenor Plaintiff - Appellee

v.

SCHOOL BOARD OF CONCORDIA PARISH,

> Defendant - Appellee

v.

DELTA CHARTER GROUP INCORPORATED,

> Intervenor - Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

In 2012, Delta Charter Group sought to open a public charter school in Concordia Parish, Louisiana, which is under a long-standing desegregation

1

No. 17-30548

order overseen by the Western District of Louisiana. Louisiana law states that charter schools "shall . . . [b]e subject to any court-ordered desegregation plan in effect for the city or parish school system." La. Stat. Ann. § 17:3991(C). Delta therefore intervened in this case and asked United States District Judge Dee Drell for permission to operate in Concordia Parish. The district court granted permission after Delta and the Concordia Parish School Board entered into a consent decree obliging Delta to, among other duties, comply with the desegregation order; not impede the Board's ability to comply with the desegregation order; and enroll a student body with racial demographics reflecting the demographics of the Concordia Parish School District as a whole.

When Delta opened for the 2013–14 school year, only 15% of Delta's 323 accepted students were African American. In contrast, enrollment in Concordia Parish School District was 49.5% African American and 49% white. Delta's enrollment, in the Board's view, therefore violated the terms of the consent decree, and in June 2014, the Board requested relief from the district court. Years of discovery and failed negotiations followed, during which Delta continued to operate and to enroll predominantly white (greater than 80%) student bodies. In February 2017, the district court held a three-day evidentiary hearing and found that Delta had violated the consent decree. In June 2017, the district court imposed further remedies to enforce the decree. Delta has appealed.

This appeal presents a narrow question: whether a party is bound by the terms of a consent decree that it voluntarily entered. We hold that it is and generally affirm, but vacate one provision of the ordered relief that exceeded the district court's remedial authority.

I.

In 2012, the Louisiana Board of Elementary and Secondary Education ("BESE") approved Delta Charter Group to operate the Delta Charter School

2

No. 17-30548

of Math, Science, and Technology in Ferriday, Louisiana, as a "Type 2" charter school within Concordia Parish.[1]  Under Louisiana law, charter schools are "independent public school[s]" and are "subject to any court-ordered desegregation plan in effect for the city or parish school system." La. Stat. Ann. §§ 17:3973(2)(a), 17:3991(C)(3); *see also Iberville Par. Sch. Bd. v. Louisiana State Bd. of Elementary & Secondary Educ.*, 248 So. 3d 299, 308 (La. 2018) (finding that Type 2 charter schools are "public schools" under the Louisiana constitution).    Since 1970, Concordia Parish has operated under a desegregation order entered by the Western District of Louisiana.  Accordingly, Delta moved to intervene in the case in September 2012 and asked that the district court allow it to open Delta Charter School.

While a desegregation order remains effective, the district court has a "constitutional duty" to enforce the order and to ensure that the school district "take[s] all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1458, 1453 (5th Cir. 1993) (quoting *Freeman v. Pitts*, 503 U.S. 467, 485 (1992)).  A district court asked to authorize a new charter school will consider whether the proposed school would undermine the ongoing desegregation order and may impose conditions on the school's operation if necessary.  *See, e.g., Cleveland v. Union Par. Sch. Bd.*, 570 F. Supp. 2d 858, 867–68, 871 (W.D. La. 2008); *Berry v. Sch. Dist. of City of Benton Harbor*, 56 F. Supp. 2d 866, 875 (W.D. Mich. 1999).  In this regard, we note that new school districts hoping to separate from existing

---

[1] There are five categories of charter schools under Louisiana law.  Types 1 and 3 are operated pursuant to a charter between the nonprofit corporation responsible for operating the school and the local school board; Types 2 and 5 are operated pursuant to a charter between the nonprofit corporation and the BESE; and Type 4 schools are operated pursuant to a charter between the local school board and the BESE.  La. Rev. Stat. § 17:3973(2)(b). Delta Charter School is a Type 2 school.  Only Type 2 schools may draw students from anywhere in the state; enrollment at all others is restricted to students who live in the local city, parish, or school district in which the school operates.  *Id.*

districts governed by desegregation orders must "prove the availability of procedures, methods, and agreements that . . . will avoid any adverse impact upon the present federal plan of desegregation . . . [and] support implementation of those procedures." *Valley v. Rapides Par. Sch. Bd.*, 173 F.3d 944, 945 (5th Cir. 1999) (en banc); *see also Ross v. Houston Indep. Sch. Dist.*, 583 F.2d 712, 714 (5th Cir. 1978) ("The division of a school district operating under a desegregation order can be permitted only if the formation of the new district will not impede the dismantling of the dual school system in the old district." (citing *Wright v. Council of the City of Emporia*, 407 U.S. 451 (1972) and *United States v. Scotland Neck City Bd. of Educ.*, 407 U.S. 404 (1972))).

Accordingly, in January 2013, Delta and the Board entered into a consent decree establishing the terms and conditions for Delta Charter School's operation. "To ensure that [Delta] meets its desegregation obligations consistent with orders entered in this case," the consent decree "enjoined [Delta] from failing to implement in good faith" various obligations. Among other promises, Delta agreed to "comply with the desegregation obligations mandated by this case" and to "take no action that will impede the Concordia Parish School Board's ability to fulfill its obligations to comply with the Orders in this case and applicable federal desegregation law." Delta also agreed to advertise and recruit students within African American communities, and to maintain a student body that "reflect[s] the racial demographics of the Concordia Parish School District." If "the percentage of black student enrollment in Delta Charter School is 10% or more below the black student enrollment in the Concordia Parish School District," Delta committed that it would "analyze the causes of this enrollment rate, propose how to modify the enrollment rate, and submit the analysis and proposal to the Court and the parties."

4

No. 17-30548

When Delta opened for the 2013–14 school year, Delta enrolled 323 students, of whom only 49 (15%) were African American and 274 (85%) were white. By comparison, enrollment in Concordia Parish School District was 50% African American and 49% white in 2012. At the end of the 2013–14 school year, in June 2014, the Board moved for remedial relief, contending that Delta had failed to comply with the consent decree. The Board argued that Delta had (1) interfered with the Board's ability to satisfy its desegregation obligations by drawing white students away from disproportionately minority schools in Concordia Parish; and (2) failed to meet its enrollment targets for African American students. Delta opposed the motion, recognizing its obligations under the consent decree but contending that it "ha[d] fully complied with the Consent Order by taking affirmative steps to recruit and enroll black students."

A lengthy period of discovery and negotiations followed, and Delta continued to operate with a predominantly white student body. For the 2014–15 school year, Delta enrolled 380 students, of whom 68 (18%) were African American and 303 (80%) were white. The following year, 2015–16, Delta enrolled 455 students, of whom 89 (20%) were African American and 358 (79%) were white. For the 2016–17 year, Delta enrolled 499 students, of whom 85 (17%) were African American and 401 (80%) were white. Despite Delta's consistent failure to achieve its enrollment targets, the status reports that it filed in 2015, 2016, and 2017 pursuant to the consent decree neither analyzed the causes of Delta's low enrollment rate of African American students nor proposed corrective measures.

The district court set a hearing on the Board's motion for relief on Monday, February 13, 2017. The Friday before, Delta filed a "motion for partial relief" from the 2013 consent decree. Delta sought relief "from any condition of the Order which may limit . . . the number of students by race

5

which Delta Charter may accept for enrollment in any given school year." Relying on its self-asserted "good faith commitment to fulfilling its obligations," and a previously undisclosed expert report suggesting that Delta's operation was "not impeding the District's ability to meet its obligations," Delta argued that the consent decree's enrollment requirements were "no longer justified." In the alternative, Delta sought "dismissal" of the Board's motion "for failure to state a claim" on the ground that "a district court should not enjoin an independent school district, such as a charter school, from accepting students just because the transfer may increase racial imbalance." The district court refused to consider Delta's last-minute filing, however, because it was filed immediately before the "long-noticed hearing" and relied on a previously undisclosed expert witness. On the same basis, the district court also refused to consider any testimony from the school district's expert. Delta does not challenge these untimeliness findings on appeal.[2]

At the hearing, the Board and the United States, as intervenor, presented evidence that Delta had violated the consent decree. An expert witness for the United States, Dr. Genevieve Siegel-Hawley, testified that Delta was drawing "disproportionately white" students away from Concordia Parish and thus having "a negative impact on the district's ability to desegregate." For example, she testified that schools in Ferriday, a majority African American town, lost 20% of their white students to Delta in its first year of operation, and lost a further 5 to 10% each year thereafter. In Concordia Magnet School, which at 50% white student enrollment is Concordia Parish's most racially balanced school, lost 15% of its white students to Delta in Delta's first year.

---

[2] As the concurring opinion explores, Delta remains free to move to modify the consent decree on remand.

No. 17-30548

With respect to Delta's efforts to recruit African American students, Dr. Siegel-Hawley testified that there was considerably more Delta could have done. She compared Delta to the Concordia Magnet School, another "school of choice opened around the same time in the parish with a similar theme and with a lottery-based admissions policy." She explained that the magnet school was able to achieve its diversity by advertising widely through newspapers and direct mailings, providing free transportation, and conducting a dual lottery system with separate lists for African American and white students. Delta, by comparison, advertised in local newspapers but did not send out direct mailings, did not provide transportation, and maintained a lottery system that, in Dr. Siegel-Hawley's opinion, was "murky and unclear," creating the impression that "the lottery isn't fair to all applicants."

After taking evidence for three days, the district court found that Delta was in "deliberate noncompliance" with the consent decree and that its enrollment practices had "substantially impacted" the Board's ongoing desegregation efforts. After additional briefing on remedies, the district court ordered that enrollment at Delta be limited to 350 students from Concordia Parish, and that "[a]dditional students may be added from other parishes NOT under current desegregation orders unless permission for students in court-supervised parishes is granted after contradictory hearing with the affected school boards."[3]  The district court further ordered that Delta establish a diversity committee to develop recruitment strategies to increase minority

---

[3] The language of the district court's order is somewhat unclear here. The district court appears to have intended to leave unrestricted Delta's ability to enroll students from parishes not under desegregation orders but to prevent Delta from enrolling students from other parishes that are under desegregation orders absent permission from the relevant school boards. But the exact nature of the limitation placed on the enrollment of students from other parishes is irrelevant. As we explain below, the district court lacked the remedial authority to order any relief encompassing parishes other than Concordia.

No. 17-30548

student enrollment and that Delta make a good-faith effort to implement the committee's recommendations. Finally, the district court appointed a special master to monitor Delta's compliance. Delta timely appealed the district court's entry of relief for the Board.

## II.

We review the implementation of desegregation remedies for abuse of discretion. *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 238 (5th Cir. 2014). We review conclusions of law *de novo*, and findings of fact for clear error. *Id.* A finding of fact is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 296 (5th Cir. 2008) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). We must accept factual findings that are "plausible in light of the record viewed in its entirety." *Id.* (quoting *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991)).

## III.

## A.

On appeal, Delta does not limit its primary argument to the specific relief ordered from which Delta noticed its appeal, but rather sets its sights on the district court's authority to enforce the preexisting desegregation order. Delta seeks to argue that because it is an "independent," Type 2 charter school, enforcing the desegregation order against it amounts to an impermissible interdistrict remedy. It relies on *Milliken v. Bradley*, 418 U.S. 717 (1974), where the Supreme Court held that interdistrict remedies may not be imposed in school desegregation cases absent "an interdistrict [constitutional] violation and interdistrict effect." *Id.* at 744–45. Delta argues that because the district

court never found an interdistrict violation, the court lacked the authority to enforce the desegregation order in effect in Concordia Parish against it.[4]

But here, the district court's remedial authority derives from the consent decree itself, in which Delta expressly agreed that "it is governed by and that it will comply with the desegregation obligations mandated by this case." Delta made this and other promises to assure its ability to operate within Concordia Parish. Indeed, Delta repeatedly argued before the district court that a "Type 2 charter school is subject to any court-ordered desegregation plan in effect for the city or parish school system"; that the district court "ha[d] the authority to render a decision as to the authority to open any new public school, including public charter schools in Concordia Parish"; that "the [c]ourt's role in determining what conditions or obligations apply to Delta Charter's continued operation should be guided by a determination of whether the charter school is adversely impacting the racial balance in Concordia Parish School District"; that Delta was "governed by the obligations set forth in the consent order"; and that the district court had "authority to review that" and could award further relief if the court found "that Delta Charter had violated the terms of the consent order in a manner which has caused [the parish] harm." As a result, the only question presented is whether a court can enforce desegregation obligations incorporated into a consent decree against a party that entered that decree. We hold that it can.

Consent decrees are hybrid creatures, part contract and part judicial decree. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 519 (1983). The "voluntary nature of a consent decree

---

[4] In its reply brief, without citation to any relevant caselaw, Delta argues that the district court lacked jurisdiction to entertain its September 2012 motions to intervene in the ongoing desegregation case and for authorization to open its school. We have reviewed Delta's original district court filings and perceive no lack of subject matter jurisdiction.

No. 17-30548

is its most fundamental characteristic"; "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Id.* at 521–22; *see also id.* at 525 ("[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree."). Consequently, a consent decree can sweep more broadly than can other forms of court-ordered relief. *Id.* at 525 ("[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial.").

Of course, the permissible scope of a consent decree is not unlimited. A "consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). The consent decree here falls comfortably within those bounds: the desegregation requirements arise out of and serve to resolve a long-standing desegregation effort in Concordia Parish properly overseen by the district court;[5] are within the scope of the case; and further the equal-protection objectives of the original complaint.

## B.

Delta alternatively argues that the district court's order granting further relief exceeded its remedial authority because it improperly relied on purported violations of state law not incorporated into the consent decree and was not justified by evidence that Delta had either itself violated the

---

[5] The Board was previously found to have engaged in unconstitutional racial discrimination. *See, e.g., Smith v. Concordia Par. Sch. Bd.*, 445 F.2d 285, 285 (5th Cir. 1971). The Board has not moved for a declaration of unitary status, and the district court retains jurisdiction. *Lee v. Macon Cty. Bd. of Ed.*, 584 F.2d 78, 81 (5th Cir. 1978).

Constitution or impeded the Board's desegregation efforts.  We find these arguments unavailing.

First, the district court did not rely on any purported violations of state law in granting the Board's motion for further relief or crafting additional remedies.  The district court discussed state law only after having "already ruled that . . . Delta did not adhere to the terms of the consent judgment into which it voluntarily entered."  The district court raised issues of state law only to clarify "the approval [Delta] must seek and be granted in order to implement changes outside of the consent judgment."

Second, no finding of an independent constitutional violation was necessary.  As discussed above, by entering into the consent decree, Delta vested the district court with authority to ensure Delta's compliance.  *See United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) ("[D]istrict courts have the power and ordinarily must hold parties to the terms of a consent decree.").  To enforce the consent decree, the district court did not need to find that Delta violated the Constitution, only that it violated the consent decree.

Third, and most importantly, considerable evidence showed that Delta had violated the consent decree and "substantially impacted Concordia's compliance with ongoing desegregation orders."  There was evidence presented that Delta disproportionately drew away white students and white teachers from Concordia Parish, making it more difficult for the Board to achieve its desegregation obligations.  For example, schools in Ferriday, the only "zone" in Concordia Parish that is majority African American, lost 20% of their white students to Delta in Delta's first year of operation.  Ferriday schools continued to lose 5 to 10% of their white students to Delta each year over the next three years.  With respect to teachers, there was evidence presented that of the 16 teachers Delta hired away from Concordia Parish schools, 15 were white.  Furthermore, the consent decree required Delta's enrollment to reflect the

racial demographics of Concordia Parish School District. It is undisputed that Delta's enrollment fell far short of that target and that Delta failed to submit the required reports explaining and addressing its shortcoming. The record as a whole supported the district court's findings of noncompliance.

Finally, Delta challenges the specific relief ordered. It suggests that the district court abused its discretion by imposing remedies unrelated to the consent decree's primary purpose of facilitating the Board's ability to achieve unitary status.

Most of the relief ordered plainly enforces the commitments listed in the original decree. The consent decree required that Delta recruit and advertise "in a manner that ensures that black students and parents are informed about the school," and that it enroll a student body reflective of the racial demographics of Concordia Parish School District. The new requirement that Delta establish a diversity committee, with oversight from the special master, will ensure that Delta creates a long-term plan for recruitment and enrollment that is consistent with its consent decree obligations.

The consent decree also enjoined Delta from taking any action that would impede the Board's ability to comply with the existing desegregation order. The new 350-student enrollment limit on students from Concordia Parish enforces that requirement, particularly in the near term, by capping the number of white students that Delta can draw away from Concordia Parish before Delta is able to improve its recruitment and enrollment practices.

One aspect of the relief ordered, however, surpasses the scope of the consent decree. The district court ordered that Delta could not enroll students from *other* parishes under desegregation orders without permission from the relevant school boards. This requirement appears intended to limit Delta's interference with the desegregation obligations of other parishes. But Delta's consent decree says nothing about other parishes. The scope of the consent

No. 17-30548

decree, and the scope of this case, is limited to eliminating the vestiges of *de jure* segregation in Concordia Parish. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) ("[T]he 'scope of a consent decree must be discerned within its four corners.'" (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971))). To be sure, the issue of how a charter school that is authorized to enroll students throughout the state fits into a patchwork of desegregation orders is a very difficult one, and we have no doubt that the district court was motivated by the best of intentions in trying to address that issue. However, the district court exceeded its remedial authority by extending its reach into parishes that are not part of this case and not contemplated in the original consent decree. We therefore vacate that portion of the district court's order requiring Delta to obtain authorization before enrolling students from other parishes under separate desegregation orders.

IV.

For the foregoing reasons, we AFFIRM in part and VACATE in part.

13

No. 17-30548

JAMES C. HO, Circuit Judge, concurring:

Delta Charter School first opened its doors to K-12 students in Louisiana in 2013. The parties agree that Delta has never been found guilty of racial discrimination. A consent decree nevertheless requires Delta to adopt various racial balancing policies as a condition of operating the school.

Among other things, the consent decree requires that "Delta Charter Group's student enrollment will reflect the racial demographics of the Concordia Parish School District." For example, the "Kindergarten class for the 2017–2018 school year . . . shall at all times be comprised of equal number of minority (African-American) and non-minority (Caucasian and other) students (i.e., a 1:1 ratio)." Delta must also "amend its . . . lotteries to incorporate a preference for a student who seeks to enroll at Delta Charter School from a Concordia Parish school where his/her race is overrepresented compared to the overall racial demographics of the District."

The district court required these racial balancing requirements pursuant to a desegregation order entered against the Concordia Parish School Board in 1970—nearly half a century before the opening of Delta Charter School.

Delta opposes these racial balancing requirements as unconstitutional. In so doing, Delta raises an important question: If a charter school wishes to open and operate in geographic proximity to a public school district that is still subject to a decades-old desegregation order—and the charter school has itself never been found guilty of segregation—can a federal court nevertheless impose racial balancing requirements on the charter school?

The parties agree that this weighty constitutional question is an issue of first impression. But I agree with the majority that we are not in a position to answer that question today, because Delta has not adequately presented it at

this time.  Accordingly, I join the majority opinion and agree that Delta must present these issues in a future proceeding before the district court.

## I.

During oral argument, Delta made clear that it questions the constitutionality of the racial balancing policies it is currently required to administer.  And in the district court, Delta did file a motion asking the district court to modify the consent order by removing the racial balancing provisions.

But as the majority opinion correctly points out, Delta did so in untimely fashion, on the eve of a district court hearing on the Concordia Parish School Board's motion for further relief under the consent order.  What's more, Delta's notice of appeal states that it is appealing from the grant of further relief to the School Board under the consent order—not the denial of its own motion to modify the consent order.  Indeed, Delta's reply brief states that the district court "has yet to rule" on its motion.  So even assuming the issue was squarely presented below, it is not properly before us on appeal.

## II.

On remand, Delta is entitled to a fair hearing on its constitutional challenge to the racial balancing requirements.  The claim is an important one, because there are serious questions here that should be litigated fully.  Indeed, the Supreme Court has provided two recent signals suggesting that we should generally be loath to impose racial balancing obligations on institutions that, like Delta, have never been found guilty of engaging in racial discrimination.

First, in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), the Court held unconstitutional certain racial balancing measures taken by the Seattle and Jefferson County school districts.  As Chief Justice Roberts explained on behalf of himself and three other justices: "Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society,

contrary to our repeated recognition that '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Id.* at 730 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

The racial balancing policies challenged here are indistinguishable from those held unconstitutional in *Parents Involved*, as the parties acknowledged at oral argument. Both the United States and the School Board nevertheless contend that *Parents Involved* should not apply to Delta, because the Seattle and Jefferson County school districts are not currently subject to desegregation orders. But that only begs the question why *Parents Involved* would not also apply to a charter school that likewise has never been found guilty of segregation. As the Chief Justice put it: *"For schools that never segregated on the basis of race, . . .* the way to achieve a system of determining admission to the public schools on a nonracial basis is to stop assigning students on a racial basis. The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Id.* at 747 (emphasis added, quotations and citations omitted).

Second, in *Shelby County v. Holder*, 570 U.S. 529 (2013), the Court held that longstanding measures to eradicate the effects of historical discrimination must be justified by contemporary realities. Decision-makers ought to "identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions," rather than "rely simply on the past." *Id.* at 553.

A court order that treats Delta as a modern-day manifestation of Concordia Parish and its shameful legacy of racial segregation, without sufficient evidentiary basis, risks running afoul of this standard. In defense of the court order, the United States equates new charter schools like Delta to a so-called "splinter" school district—that is, "a new school district [carved out]

from an existing district that has not yet completed the process of dismantling a system of enforced racial segregation." *Wright v. Council of City of Emporia*, 407 U.S. 451, 453 (1972).

But Delta is quite different from a splinter district. The splinter district cases deal with steps taken by "state or local officials" to carve new public school districts out of old ones—not private citizens seeking to operate a charter school within geographic proximity of an existing district. *United States v. Scotland Neck City Bd. of Ed.*, 407 U.S. 484, 489 (1972). There is no institutional continuity between the Concordia Parish public school system and Delta. To the contrary, Delta appears to operate over the *opposition* of Concordia Parish. Accordingly, if presented with these facts, the Supreme Court might well find that Delta is an entirely new entrant into the Concordia Parish community, and should not be presumed discriminatory absent evidence of its own wrongdoing.

### III.

If the School Board believes Delta is masking its true aims and engaged in the evil institution of racial segregation, it should present its evidence to the district court and request a finding of racial discrimination. Indeed, the Board would appear to welcome such an opportunity. It suggests, for example, that it is no coincidence that Delta uses the same facilities as a previous "segregationist academy." For its part, Delta responds that it is simply cheaper to use buildings that have already been built to serve as classrooms, than to construct new classrooms from scratch. Both sides deserve full and fair opportunity to present their case to the district court. Just as Delta can move to modify the racial balancing provisions as unconstitutional, the Board can defend those provisions as necessary due to racial discrimination by Delta.

In the absence of a judicial finding of discrimination, however, it remains an open question whether these racial balancing provisions can satisfy the

No. 17-30548

strict scrutiny required by the Supreme Court, based on nothing more than geographic proximity to a school district subject to a decades-old desegregation order that long predates the birth of the charter school.

The Supreme Court is strict, because the harm is stark. No matter how well-intentioned the policy may be, injury is a mathematical certainty, because educational admissions is a zero-sum game: When a school offers admission based on a student's race, it denies admission based on a student's race. For every person you "help" due to race, you necessarily hurt another person due to race. And only by speaking plainly do we ensure fidelity to the Constitution.

\* \* \*

Over six decades have passed since *Brown v. Board of Education*, 347 U.S. 483 (1954). Yet our Nation continues to struggle to live up to its central vision—that no matter the circumstances of one's birth, every child deserves a shot at the American Dream—and the key to social mobility is a good education. As *Brown* observes, "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity . . . *must be made available to all on equal terms.*" *Id.* at 493 (emphasis added). *See also Brown v. Board of Education*, 349 U.S. 294, 300–1 (1955) ("[a]t stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory" and "nonracial basis"). The debate over the meaning and implementation of this timeless vision remains as hotly contested today as ever.

I nevertheless join my colleagues in saving these weighty issues for another day. I do so not despite, but precisely because of, the fundamental importance of these issues. The continuing legacy of *Brown* within the context of newly formed charter schools is a significant constitutional question—and, as the parties agree, an uncharted one—that deserves more thorough and

18

rigorous analysis and treatment than has been provided to the district court in this case to date.