# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 11, 2022

Lyle W. Cayce
Clerk

No. 21-30514

Tracie T. Borel, *on behalf of her minor children*, AL and RB;
Genevieve Dartez, *on behalf of her great-grandchild*, DD,

*Plaintiffs—Appellees*,

*versus*

School Board Saint Martin Parish,

*Defendant—Appellant*,

*versus*

United States of America,

*Intervenor—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No: 6:65-CV-11314

Before Higginbotham, Haynes, and Wilson, *Circuit Judges*.
Haynes, *Circuit Judge*:

We again revisit this school desegregation case, which has been pending in federal court for over five decades. In this appeal, the St. Martin Parish School Board (the "School Board") challenges the district court's

No. 21-30514

(1) exercise of remedial jurisdiction over the case, (2) denial of its motion for unitary status, and (3) imposition of additional equitable relief.  For the reasons set forth below, we conclude that the district court properly retained remedial jurisdiction over the action; we otherwise AFFIRM in part and REVERSE in part.

## I.

Our earlier opinion, *Thomas ex rel. D.M.T. v. School Board St. Martin Parish*, 756 F.3d 380 (5th Cir. 2014), sets forth the full factual and procedural background of this case.  *Id.* at 382–83.  We discuss only the facts relevant to the current appeal here.

In 1965, Plaintiffs-Appellees—students in the St. Martin Parish School District (the "District")—filed a suit for injunctive relief under 42 U.S.C. § 1983 alleging that the School Board was operating a segregated school system in violation of *Brown v. Board of Education*, 347 U.S. 483 (1954). The district court determined that the School Board had engaged in intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and ordered the parties to work together to implement a desegregation plan.  After several years of remedial efforts, the district court issued an order (the "1974 Order") enjoining the School Board from taking further discriminatory actions and moving the case to the inactive docket.  The case remained there, undisturbed, for several decades.

In 2009, the case became active again when it was reassigned to a new judge.  The School Board moved to dismiss, arguing that jurisdiction had lapsed.  The district court disagreed, determining that the 1974 Order did not resolve whether vestiges of past discrimination remained, and therefore the case was still alive.  The School Board appealed, and we affirmed.  *Thomas*, 756 F.3d at 387.  We concluded that the 1974 Order was not a final order dismissing the case, and we remanded to the district court to determine

2

whether "the vestiges of *de jure* segregation had been eliminated as far as practicable." *Id.* at 387–88 (quotation omitted).

On remand, the parties engaged in discovery related primarily to the six areas of operation relevant to unitary status, as identified by the Supreme Court in *Green v. County School Board*, 391 U.S. 430 (1968). The parties engaged in settlement negotiations and subsequently entered into a series of consent orders, which were eventually consolidated into a superseding consent order reflecting the parties' respective obligations. Under this order, the School Board agreed to "take affirmative action to disestablish all, if any, remaining vestiges of the former *de jure* segregated system and to eliminate all, if any, remaining effects of that prior dual school system to the extent practicable." Under the district court's supervision, the case marched on.

Five years after we remanded to the district court, the School Board moved for a finding of unitary status in the remaining *Green* areas. Plaintiffs opposed, as did the United States as intervenor. The district court conducted an evidentiary hearing and subsequently granted in part and denied in part the School Board's motion. As relevant to this appeal, it (1) concluded that the School Board failed to achieve unitary status in the *Green* areas of student assignment, faculty assignment, and quality of education; and (2) ordered further equitable relief, including the closure of one school in the District, Catahoula Elementary School. The School Board timely appealed.

A brief overview of the District is helpful in understanding the present dispute. The District educates over 7400 students and employs around 480 faculty members across sixteen schools that are divided into four attendance zones. The zone relevant to this appeal, St. Martinville Zone, includes three elementary schools: Catahoula Elementary School, the Early Learning Center, and St. Martinville Primary. Catahoula Elementary School serves

students from Pre-K to 5th Grade.  The Early Learning Center serves students from Pre-K to 1st Grade.  Students at the Early Learning Center then matriculate to St. Martinville Primary, which serves students from 2nd Grade to 5th Grade.

The parties agree that prior to 1965—the year the District's students launched the initial litigation—Catahoula Elementary School was a "white school."  Its student body has continued to be virtually all-white ever since.  By contrast, the Early Learning Center and St. Martinville Primary had student bodies consisting primarily of Black students.  Since this court remanded the case in 2014, the School Board attempted to resolve the imbalance by implementing several transfer and STEM programs; nevertheless, the student body of Catahoula Elementary School, the Early Learning Center, and St. Martinville Primary remain racially imbalanced.

## II.

We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).  *See Moore v. Tangipahoa Par. Sch. Bd.*, 843 F.3d 198, 200 (5th Cir. 2016) (per curiam) ("In the school desegregation context, the courts of appeals routinely exercise appellate jurisdiction under § 1292(a)(1) over orders . . . that impose a continuing supervisory function on the court. . . .[E]ach such injunction is appealable regardless of finality." (internal quotation marks and citation omitted)).  However, the School Board challenges the district court's ongoing ability to exercise remedial jurisdiction over this case.  Thus, we review the district court's exercise of remedial jurisdiction de novo. *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 198 (5th Cir. 2000).

In an ongoing institutional reform case like this one, jurisdiction extends to the "the correction of the constitutional infirmity." *Brumfield v. La. St. Bd. of Educ.*, 806 F.3d 289, 298 (5th Cir. 2015) (quotation omitted).

A district court has the continuing ability to order affirmative relief to cure violations flowing from the original constitutional violation, *Milliken v. Bradley*, 433 U.S. 267, 282 (1977), and must retain jurisdiction over a school desegregation case until the vestiges of past segregation have been eliminated to the extent practicable, *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 294 (5th Cir. 2008); *accord Davis v. E. Baton Rouge Par. Sch. Bd.*, 721 F.2d 1425, 1434 (5th Cir. 1983) (explaining that until a school board "eliminate[s] 'root and branch' the system wide-effects" of past discrimination, a district court "must retain jurisdiction to ensure that the present effects of past segregation are completely removed").

Relatedly, a district court may also obtain remedial authority over litigation from a party's voluntary entrance into a consent decree. *See Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018). As we have recognized, "[c]onsent decrees are hybrid creatures, part contract and part judicial decree"—they represent the "agreement of the parties" and subsequently "create[] the obligations" that the parties must abide by. *Id.* (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 521-22 (1986)). As such, we have held that a district court may "enforce desegregation obligations incorporated into a consent decree against a party that entered that decree." *Id.*

Guided by these principles, we are satisfied of the district court's remedial jurisdiction in this case. The School Board's main objection to the contrary is that the vestiges of de jure segregation have been eliminated to the extent practicable—it argues that there is no causal connection between the pre-1965 dual-school system and any remaining racial imbalances present in the District. In the absence of vestiges flowing from the original constitutional violation, the School Board urges that the district court lacks jurisdiction to order additional relief.

We disagree.  The School Board's position is fatally undermined by its own post-remand actions in this case.  After we instructed the district court to determine whether "vestiges of de jure segregation remained," the School Board did not argue for a lack of vestiges—instead, for *five years*, it engaged in extensive discovery, conceded that it was no longer "seeking a finding of unitary status" in student assignment, and entered into several consent orders contradicting this very argument.  The School Board agreed to the binding effect of the consent order and voluntarily assumed the obligation to "provide educational programs and services without discriminating on the basis of race and in a manner that does not perpetuate or further racial segregation" and to take "remedial measures . . . to eliminate, to the extent practicable, the vestiges of the former segregated system in the District."

The School Board's concessions and voluntary actions in the post-remand proceedings are fatal to its jurisdictional challenge in two ways.  First, the School Board's agreement to consent orders intended to eliminate vestiges, rather than contesting whether any vestiges exist leads us to the conclusion that facts support the remainder of such vestiges of segregation.  Therefore, the district court may continue to issue relief to cure that constitutional violation.  *See Milliken*, 433 U.S. at 282.  Second, the School Board's assumption of obligations under the superseding consent order confers remedial jurisdiction on the district court to enforce those obligations.  *See Smith*, 906 F.3d at 334.  In light of these two considerations, we hold that the district court properly exercised its continuing remedial jurisdiction over the case.

## III.

Having concluded that the district court had jurisdiction, we now turn to the merits.  The School Board first challenges the district court's denial of

unitary status. Because a unitary determination is a factual finding, we review for clear error. *Anderson*, 517 F.3d at 296. A finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" even if some evidence exists to support the finding. *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

In the school desegregation context, the Supreme Court has instructed that the ultimate goal of litigation is to "transition to a unitary, nonracial system of public education." *See Green*, 391 U.S. at 436. Because "'unitary' is not a precise concept," *Freeman v. Pitts*, 503 U.S. 467, 487 (1992), the Supreme Court has identified certain features of the school system that must be freed from racial discrimination before the desegregation process will be deemed successful: student assignment, faculty assignment, staff assignment, facilities and resources, transportation, and extracurricular activities, *Green*, 391 U.S. at 435. Other ancillary factors, such as quality of education, are also relevant. *See Freeman*, 503 U.S. at 482–83. To achieve unitary status in each of these areas, a defendant district is required to demonstrate that it has (1) "complied in good faith with desegregation orders" for a period of at least three years and (2) "eliminated the vestiges of prior *de jure* segregation to the extent practicable." *Anderson*, 517 F.3d at 297; *see United States v. Fletcher ex rel. Fletcher*, 882 F.3d 151, 157–60 (5th Cir. 2018).

The district court here determined that the School Board failed to achieve unitary status in three categories: student assignment, faculty assignment, and quality of education (including discipline and graduation pathways). We address each in turn.

First, as to student assignment, the district court found that the School Board failed both requirements of the unitary test. At the vestiges

prong, the district court observed that the School Board did not meet its desegregation goals in several schools in the St. Martinville Zone, including Catahoula Elementary School, St. Martinville Primary, and the Early Learning Center—Catahoula Elementary School remained predominantly white, and consequently, St. Martinville Primary and the Early Learning Center remained predominantly Black. The district court found that these racial imbalances were vestiges of de jure segregation because Catahoula Elementary School was, prior to 1965, built in an all-white town for white students.

We conclude that this finding was plausible in light of the record. We've previously recognized that, "during the *de jure* segregation era[,] schools were built to accommodate students by race in areas where population was predominantly of a single race." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1044 (5th Cir. 1986). As such, we've noted that because "persons normally gravitate toward[s] the schools that serve them, the intentional acts by" a school district "before desegregation" could insure "that the immediate communities around these schools would be of one race." *Id.* Thus, if, as the district court found, the School Board here intentionally built Catahoula Elementary School in an all-white town during de jure segregation, "[t]he very demographic factors that [currently] separate residential areas by race" in the St. Martinville Zone "are in part a vestige of past segregative practices by the [School] Board." *Id.* at 1043–44.

At the evidentiary hearing, an expert witness testified that Catahoula Elementary School was historically an all-white school, has remained virtually all-white in the interim period, and therefore has been persistently racially identifiable. The district court gave credit to that testimony, and the School Board failed to present any countervailing evidence contradicting the District's intent in selecting Catahoula Elementary School's location. In the absence of such evidence, and because we must give substantial deference to

the district court's factual findings, *see Anderson*, 517 F.3d at 296, we conclude that the district court did not clearly err in determining that the remaining racial imbalances are vestiges of de jure segregation.

We similarly find no error in the district court's conclusion that the School Board failed at the compliance prong—this conclusion too is plausibly supported by the record. The parties agreed that the School Board's efforts in eliminating racial imbalances in student assignment would be assessed by a plus or minus fifteen percentage point (+/- 15%) variance standard (as memorialized in the superseding consent order). This standard would assess whether the percentage of Black or white students enrolled in a particular school exceeded +/- 15% of the District-wide actual enrollment of Black students from that grade band (i.e., elementary school, middle school, high school). A school with enrollment demographics outside the variance would be considered a racially identifiable school. The undisputed objective data demonstrates that the School Board failed to satisfy that standard in several schools. Because the School Board failed at its own agreed-upon metric, the district court did not clearly err in finding a lack of compliance with the desegregation order.

Second, as to faculty assignment, the district court similarly found that the School Board failed to remedy vestiges of de jure segregation and to demonstrate good-faith compliance with the superseding consent order. On the compliance prong, the district court noted the numerous ways in which the School Board's efforts in the recruitment, hiring, and retention of Black teachers fell short of the requirements imposed by the superseding consent order: a decrease in the number of Black teachers at high schools in the District, a failure to recruit Black faculty from programs with diverse applicants, and a disregard for other potential recruitment methods of Black candidates. These findings were amply supported by testimony from expert witnesses and the District's Supervisor of Human Capital. Accordingly, we

conclude that the district court did not clearly err in denying unitary status as to faculty assignment based on the School Board's lack of "sustained good faith effort." *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. Unit A July 1981).

Finally, the district court found that the School Board failed to comply with its obligations regarding two subsets of the quality of education category—graduation pathways and student discipline. Because quality of education falls under the "ancillary factor" category, it does not present specific legal requirements. Instead, the School Board's obligations to remove vestiges of segregation in graduation pathways and student discipline are governed by the superseding consent order. *See Smith*, 906 F.3d at 334.

With regard to graduation pathways, the superseding consent order required the School Board to "take steps to eliminate and avoid, to the extent practicable, racial disparities in all diploma programs District-wide and to increase Black student enrollment in the most academically rigorous and college preparatory programs in its secondary schools." But the School Board failed to do so—far fewer Black students selected the more academically challenging graduation pathways. Similarly, as to student discipline, the superseding consent order required the School Board to "administer[] student discipline in a fair and non-discriminatory manner" and to "ensure that students remain[ed] in the regular classroom environment to the greatest extent possible." But the district court found that the School Board failed to resolve racial imbalances here as well—more Black students received punitive and exclusionary disciplinary methods than white students.

We determine that the district court's conclusions here were not clearly erroneous. In its thorough opinion, the district court enumerated the specific tasks that the School Board was required to undertake in order to

reduce racial disparities in graduation pathways and student discipline pursuant to the superseding consent order—yet, the record evidence flatly demonstrates that the School Board failed to take those actions.  We must give substantial deference to the district court's factual findings and credibility determinations.  Having done so, we conclude that the district court's determinations are substantially and plausibly supported by the record, and we see no reason to disturb them on appeal.

To sum up, we conclude that the district court did not clearly err in determining that the School Board failed to achieve unitary status in student assignment, faculty assignment, and the quality of education.  The denial of unitary status was, therefore, not clearly erroneous.  We thus affirm that decision and remand for continuing oversight of the efforts to reach unitary status.

## IV.

Having affirmed the district court's decision regarding unitary status, we turn to the other decision opposed by the School Board:  closing Catahoula Elementary School.

To start, we recognize that "[t]he fashioning of relief in a school desegregation case is an exercise of the district court's discretion in creating an equitable remedy." *Valley v. Rapides Par. Sch. Bd.* (*Valley I*), 646 F.2d 925, 938 (5th Cir. Unit A May 1981).  Accordingly, our review of desegregation remedies is limited to ascertaining whether the district court abused its discretion. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Valley v. Rapides Par. Sch. Bd.* (*Valley II*), 702 F.2d 1221, 1225 (5th Cir. 1983).  When determining "the validity of provisions in a desegregation plan," we evaluate whether the imposed remedy is "reasonably related to the ultimate objective" of desegregation. *Tasby v. Wright*, 713 F.2d 90, 97 (5th Cir. 1983)

(quotation omitted); *United States v. CRUCIAL*, 722 F.2d 1182, 1189 (5th Cir. 1983).

We have recognized "that the existence of a few racially homogenous schools within a school system is not per se offensive to the Constitution." *Valley II*, 702 F.2d at 1226. But the Supreme Court has instructed us to give "close scrutiny" to predominantly one-race schools to ensure that "school assignments are not part of state-enforced segregation." *Swann*, 402 U.S. at 26. Accordingly, we have held that racially homogenous schools are not permissible "where reasonable alternatives may be implemented." *Valley II*, 702 F.2d at 1226. But we've also rejected the idea that a school board must implement "awkward, inconvenient, or even bizarre" measures where remaining racial imbalances are due to independent demographic forces. *Hull v. Quitman Cnty. Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) (internal quotation marks and citation omitted). Rather, we've encouraged district courts to achieve the ultimate goal of desegregation through "reasonable, feasible, and workable" remedies, particularly in the later phases of court supervision. *Davis*, 721 F.2d at 1434 (quotation omitted); *see Hull*, 1 F.3d at 1454.

Balancing these considerations, we conclude that the district court erred in closing Catahoula Elementary School. Although we are mindful of the discretion afforded to the district court's choice of equitable remedy, "school closures . . . as desegregation techniques require careful scrutiny." *CRUCIAL*, 722 F.2d at 1189; *see also Valley I*, 646 F.2d at 940. Indeed, "[t]he closing of a facility built and maintained at the expense of local taxpayers is a harsh remedy, which should only be employed if absolutely necessary to achieve the goal of a unitary system after all other reasonable alternatives have been explored." *Valley I*, 646 F.2d at 940. The district court's closure of Catahoula Elementary School at this stage in the proceedings does not align with our precedent.

There's no doubt that closing Catahoula Elementary School was a harsh remedy. At the evidentiary hearing, one witness testified generally that closing a school in a small community is a very traumatic experience and closing Catahoula Elementary School specifically would cause a loss to the entire community. Another witness posited that Catahoula Elementary School, along with the church, was one of the main pillars of the community. That witness observed that the school generally had positive performance scores and a lack of disciplinary issues.

For several reasons, we doubt whether this extreme remedy was "absolutely necessary" to achieve desegregation. *See Valley I*, 646 F.2d at 940. First, Plaintiffs' expert witness conceded that closing Catahoula Elementary School would not necessarily create immediate compliance with the +/- 15% variance. Indeed, even if every student currently at Catahoula Elementary School attended the Early Learning Center and St. Martinville Primary, the School Board would still have to implement other programs to establish compliance. Because closure would not immediately resolve racial imbalances, the district court should have considered other "[e]qually effective alternatives" before imposing the drastic remedy. *See id.* at 940–41.

Such alternative solutions were available. The School Board's expert witness proposed that the District could see greater desegregation results and immediate compliance with the +/- 15% variance by redrawing attendance zones and boundaries. But the district court did not order this equally, or perhaps, more effective alternative. In doing so, it ignored other potentially workable and feasible proposals, jumping ahead to the most extreme remedy. Such a decision contravenes our guidance. *See Davis*, 721 F.2d at 1434.

Second, we're not convinced that closure of Catahoula Elementary School was necessary to resolve the remaining racial imbalances—the plain statistics reflect that the School Board was making slow-but-steady progress

in the removal of vestiges of state-imposed segregation.  For example, the School Board's expert opined that more Black students were moving to the town of Catahoula—therefore, Catahoula Elementary School was likely to continue to naturally desegregate on its own.  Additionally, in 2015, the district court ordered the School Board to create new student attendance zones.  These new zones accelerated the desegregation progress—the percentage of Black students in Catahoula Elementary School increased between 2015 and 2021, as did the percentage of white students in St. Martinville Primary and the Early Learning Center.  Although the numbers fell outside the agreed-upon goal range, these statistics nevertheless indicate improvement without the extreme remedy of a school closure, five decades into the court's supervision of this case.

At bottom, we are left with the following conclusion: the district court abused its discretion in closing Catahoula Elementary School.  We commend the district court for its continued efforts in overseeing the District's desegregation.  But the record demonstrates that progress has been made and progress can continue through the implementation of other reasonable, feasible, and workable remedies.  Accordingly, we reverse the closing of Catahoula Elementary School and remand for consideration of other methods of addressing that concern.

We therefore AFFIRM in part and REVERSE in part; we REMAND this case in accordance with this opinion.